

**OLYMPUS INSURANCE COMPANY**
**Jacksonville, Florida**


**PROPERTY CATASTROPHE EXCESS OF LOSS**
**REINSURANCE CONTRACT**



# TABLE OF CONTENTS

| **ARTICLE** | | **PAGE** |
|---|---|---|
| I | BUSINESS COVERED | 1 |
| II | TERM | 1 |
| III | SPECIAL TERMINATION | 2 |
| IV | TERRITORY | 4 |
| V | EXCLUSIONS | 5 |
| VI | RETENTION AND LIMIT | 7 |
| VII | REINSTATEMENT | 7 |
| VIII | REINSURANCE PREMIUM | 8 |
| IX | DEFINITIONS | 9 |
| | Act of Terrorism | 9 |
| | Loss Adjustment Expense | 9 |
| | Extra Contractual Obligations / Loss in Excess of Policy Limits | 10 |
| | Policy | 10 |
| | Term of this Contract | 11 |
| | Runoff Reinsurer | 11 |
| | Ultimate Net Loss | 11 |
| X | OTHER REINSURANCE | 11 |
| XI | LOSS OCCURRENCE | 12 |
| XII | FHCF AND RAP LOSS REIMBURSEMENT | 14 |
| XIII | ACCESS TO RECORDS | 14 |
| XIV | AGENCY | 15 |
| XV | ARBITRATION | 15 |
| XVI | CONFIDENTIALITY | 16 |
| XVII | CURRENCY | 17 |
| XVIII | ENTIRE AGREEMENT | 17 |
| XIX | ERRORS AND OMISSIONS | 18 |
| XX | FEDERAL EXCISE TAX | 18 |
| XXI | FUNDING OF RESERVES | 18 |
| XXII | GOVERNING LAW | 22 |
| XXIII | INSOLVENCY | 22 |
| XXIV | LATE PAYMENTS | 23 |
| XXV | LIABILITY OF THE REINSURER | 24 |
| XXVI | LOSS NOTICES AND SETTLEMENTS | 25 |



| XXVII | NET RETAINED LINES | 25 |
|---|---|---|
| XXVIII | NON-WAIVER | 26 |
| XXIX | NOTICES AND CONTRACT EXECUTION | 26 |
| XXX | OFFSET | 26 |
| XXXI | SALVAGE AND SUBROGATION | 27 |
| XXXII | SANCTIONS | 27 |
| XXXIII | SERVICE OF SUIT | 27 |
| XXXIV | SEVERABILITY | 28 |
| XXXV | TAXES | 28 |
| XXXVI | INTERMEDIARY | 28 |

Schedule A

Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance - U.S.A.

Electronic Data Exclusion B (NMA2915)

Limited Communicable Disease Exclusion No. 2 (LMA5503)



## PROPERTY CATASTROPHE EXCESS OF LOSS
## REINSURANCE CONTRACT
(the "Contract")

between

## OLYMPUS INSURANCE COMPANY
**Jacksonville, Florida**
**and**
**any and all companies engaged in the business of entering into contracts of insurance as an indemnitor which are now or hereafter come under the same ownership or control, or management as Olympus Insurance Company**
(the "Company")

and

## THE SUBSCRIBING REINSURER(S) EXECUTING THE
## INTERESTS AND LIABILITIES AGREEMENT(S)
## ATTACHED HERETO
(the "Reinsurer")

## ARTICLE I

## BUSINESS COVERED

Subject to the terms, conditions and limitations set forth herein and in Schedule A attached hereto, by this Contract the Reinsurer obligates itself to accept the excess liability which may accrue to the Company under Policies in force at the effective date hereof or issued or renewed on or after that date, written and/or assumed and classified as Property business by the Company.

## ARTICLE II

## TERM

A.    This Contract shall become effective at 12:00:01 a.m., Local Time, June 1, 2023, with respect to losses arising out of Loss Occurrences commencing at or after that time and date, and shall remain in force until 12:00:01 a.m., Local Time, June 1, 2024.  "Local Time" as used herein shall mean local standard time at the location where the Loss Occurrence commences.

B.    If this Contract is terminated or expires (collectively an "Expiration") while a Loss Occurrence covered hereunder is in progress, the Reinsurer's liability hereunder shall, subject to the other terms and conditions of this Contract, be determined as if the entire Loss Occurrence had occurred prior to the Expiration of this Contract, provided that no part of such Loss Occurrence is claimed against any renewal or replacement of this Contract.



## ARTICLE III

## SPECIAL TERMINATION

A. The Company may terminate a Subscribing Reinsurer's percentage share in this Contract following the earlier of the date the Subscribing Reinsurer has notified the Company or the date the Company has actual knowledge of an occurrence of any of the following circumstances by giving written notice to the Subscribing Reinsurer setting forth the effective date of such termination, which shall be no earlier than the occurrence:

   1. The Subscribing Reinsurer has ceased assuming new or renewal property or casualty treaty reinsurance business; or

   2. A State Insurance Department or other legal authority has ordered the Subscribing Reinsurer to cease writing business; or

   3. The Subscribing Reinsurer has become insolvent or has been placed into liquidation, receivership, supervision, administration, winding-up or under a scheme of arrangement, or similar proceedings (whether voluntary or involuntary), or proceedings have been instituted against the Subscribing Reinsurer for the appointment of a receiver, liquidator, rehabilitator, supervisor, administrator, conservator or trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of its operations; or

   4. The Subscribing Reinsurer's policyholders' surplus (or the equivalent under the Subscribing Reinsurer's accounting system), as reported in such financial statements of the Subscribing Reinsurer as designated by the Company, has been reduced by 20.0% of the amount thereof at any date during the prior 12-month period (including the 12-month period prior to the inception of this Contract); or

   5. The Subscribing Reinsurer has become, or has entered into a definitive agreement to become, merged with, acquired by or controlled by any entity or individual(s) not controlling the Subscribing Reinsurer's operation at the inception of this Contract; or

   6. The Subscribing Reinsurer has reinsured its entire liability under this Contract without the Company's prior written consent; or

   7. The Subscribing Reinsurer has been assigned an A.M. Best's financial strength rating of less than A- and/or an S&P Global Ratings' financial strength rating of less than A-. However, as respects Underwriting Members of Lloyd's, London, a Lloyd's Marketing Rating of less than A- by A.M. Best and/or less than A- by S&P Global Ratings shall apply; or

   8. The Subscribing Reinsurer has transferred its claims-paying authority to an unaffiliated entity; or

   9. The Subscribing Reinsurer has failed to comply with the funding requirements set forth in the Funding of Reserves Article.



The Subscribing Reinsurer shall give the Company notice of any of the above circumstances as soon as practical but no later than 30 days after the occurrence.

B.    Additionally, in the event of an occurrence of any of the circumstances listed in paragraph A of this Article, the Company shall have the option to commute the Reinsurer's liability for losses on Policies covered by this Contract.  If the Company elects to require commutation, the Company shall submit a Statement of Valuation of the outstanding claim or claims as of the last day of the month immediately preceding the month in which the Company elects to require commutation, as determined by the Company.  Such Statement of Valuation shall include the elements considered reasonable to establish the loss, including, but not limited to, paid losses, paid Loss Adjustment Expense, outstanding losses, outstanding Loss Adjustment Expense, incurred but not reported loss reserves established by the Company's internal division or the appropriate actuarial firm under external contract to the Company, salvage and subrogation, and unearned collected reinsurance premium, if any, and shall set forth or attach the information relied upon by the Company and the methodology employed to calculate the loss.  The Reinsurer shall then pay the amount requested within 30 calendar days of receipt of such Statement of Valuation, unless the Reinsurer needs additional information from the Company to assess the Company's Statement of Valuation or contests such amount.

C.    If the Reinsurer needs additional information from the Company to assess the Company's Statement of Valuation or contests the amount requested, the Reinsurer shall so notify the Company within 15 calendar days of receipt of the Company's Statement of Valuation.  The Company shall supply any reasonably requested information available to the Company to the Reinsurer with 15 calendar days of receipt of the notification.  Within 30 calendar days of the date of the notification or of the receipt of the information, whichever is later, the Reinsurer shall provide the Company with the Reinsurer's Statement of Valuation of the outstanding claim or claims as of the last day of the month immediately preceding the month in which the Company elects to require commutation, as determined by the Reinsurer.  Such Statement of Valuation shall include the elements considered reasonable to establish the loss, including, but not limited to, paid losses, paid Loss Adjustment Expense, outstanding losses, outstanding Loss Adjustment Expense, incurred but not reported loss reserves established by the Reinsurer's internal division or the appropriate actuarial firm under external contract to the Reinsurer, salvage and subrogation, and unearned collected reinsurance premium, if any, and shall set forth or attach the information relied upon by the Reinsurer and the methodology employed to calculate the loss.  If the Reinsurer's Statement of Valuation of the outstanding claim or claims is viewed as acceptable to the Company, the Reinsurer shall pay the amount due the Company, if any, as promptly as possible but no later than 15 days after the Company's acceptance of its Statement of Valuation.

D.    In the event the Reinsurer's Statement of Valuation of the outstanding claim or claims is viewed as unacceptable to the Company, the Company may either abandon the commutation effort, or may seek to settle any difference by using an independent actuary agreed to by the parties.

E.    If the parties cannot agree on an acceptable independent actuary within 15 calendar days of the date of the Reinsurer's Statement of Valuation, then each party shall appoint an actuary



as party arbitrators for the limited and sole purpose of selecting an independent actuary. If the actuaries cannot agree on an acceptable independent actuary within 15 calendar days of the date of the Reinsurer's Statement of Valuation, the Company shall supply the Reinsurer with a list of at least three proposed independent actuaries, and the Reinsurer shall select the independent actuary from that list.

F.  Upon selection of the independent actuary, both parties shall present their respective written submissions to the independent actuary. The independent actuary may, at his or her discretion, request additional information. The independent actuary shall issue his or her decision within 45 calendar days after the written submissions have been filed and any requested additional information available to the Company has been provided. Any amount due the Company shall be paid by the Reinsurer within 15 days after such decision has been issued.

G.  The decision of the independent actuary shall be final and binding. The expense of the independent actuary shall be equally divided between the two parties. For the purposes of this Article, unless mutually agreed otherwise, an "independent actuary" shall be an actuary who satisfies each of the following criteria:

　　1.  Is regularly engaged in the valuation of claims resulting from the lines of business subject to this Contract; and

　　2.  Is either a Fellow of the Casualty Actuarial Society or a Member of the American Academy of Actuaries; and

　　3.  Is disinterested and impartial regarding this commutation.

H.  Payment by the Reinsurer of the amount determined in accordance with paragraphs B, C or F of this Article, shall release the Reinsurer from all further liability for any outstanding claim or claims, known or unknown, under this Contract and shall release the Company from all further liability for any payments to the Reinsurer under this Contract.

I.  In the event of any conflict between this Article and any other article of this Contract, the terms of this Article shall control.

J.  The Company's option to require commutation under paragraph B of this Article shall survive the Expiration of this Contract.

## **ARTICLE IV**

## **TERRITORY**

The territorial limits of this Contract shall be identical with those of the Policies.



## <u>ARTICLE V</u>

### <u>EXCLUSIONS</u>

A.   This Contract does not apply to and specifically excludes the following:

    1.   Assumed reinsurance, other than business assumed from Citizens Property Insurance Corporation.

    2.   Financial guarantee or insolvency.

    3.   Mortgage Impairment insurances and similar kinds of insurances, however styled.

    4.   Losses excluded by the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance - U.S.A." attached to and forming part of this Contract.

    5.   Loss or damage caused by or resulting from war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, or martial law or confiscation by order of any government or public authority; however, this exclusion shall not apply to an Act of Terrorism.

    6.   All liability of the Company arising by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any Insolvency Fund. "Insolvency Fund" includes any guaranty fund, insolvency fund, plan, pool, association, fund or other arrangement, however denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

    7.   Losses in respect of overhead transmission and distribution lines and their supporting structures other than those on or within 1,000 feet of the insured premises.  It is understood and agreed that public utilities extension and/or suppliers extension and/or contingent business interruption coverages are not subject to this exclusion, provided that these are not part of a transmitters' or distributors' policy.

    8.   Accident and Health, Fidelity and/or Surety business.

    9.   Loss, damage, cost or expense arising from seepage and/or pollution and/or contamination, other than contamination from smoke, as excluded under the Company's Policy.

    10.   Loss, damage, cost or expense directly or indirectly caused by, contributed to by, resulting from, or arising out of or in connection with biological, chemical, radioactive, or nuclear pollution, contamination or explosion, arising out of or in connection with any Act of Terrorism, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.



11.   Loss or liability in any way or to any extent arising out of the actual, alleged or threatened presence of fungi including, but not limited to, mold, mildew, mycotoxins, microbial volatile organic compounds or other microbial contamination, as excluded under the Company's Policy.

12.   Loss or liability excluded under the provisions of the "Electronic Data Endorsement B" attached to and forming part of this Contract.

13.   Loss or liability from any Pool, Association or Syndicate and any assessment or similar demand for payment related to the Florida Hurricane Catastrophe Fund or Citizens Property Insurance Corporation.

14.   Flood, when written as such, except with respect to Policies where all or a portion of the Company's liability is retained by the Company under its quota share reinsurance.

15.   Communicable Disease as excluded under the provisions of the "Limited Communicable Disease Exclusion No. 2 (Property Treaty Reinsurance) (LMA5503)" attached to and forming part of this Contract.

B.   If the Company inadvertently issues a Policy falling within the scope of one or more of the preceding exclusions, such Policy shall be covered hereunder, provided that the Company issues, or causes to be issued, the required notice of cancellation within 30 days after an officer of the Company becomes aware that the Policy applies to excluded classes, unless the Company is prevented from canceling said Policy within such period by applicable statute or regulation, in which case such Policy shall be covered hereunder until the earliest date on which the Company may cancel.

C.   Should any legislative, judicial or regulatory entity having jurisdiction invalidate any exclusion in the Company's Policy that is also the subject of one or more of the exclusions herein, then a loss for which the Company is liable because of such invalidation shall not be excluded hereunder.

D.   The exclusions detailed in paragraph A of this Article shall not apply when they are merely incidental to the main operations or exposure of the insured, provided such main operations or exposures are also covered by the Company and are not themselves excluded from the scope of this Contract.  The Company shall be the sole judge of what is "incidental."

E.   Business that is not within the scope of this Contract may be submitted to the Reinsurer for special acceptance hereunder, and such business, if accepted by the Reinsurer shall be covered hereunder, subject to the terms and conditions of this Contract, except as modified by the special acceptance.  The Reinsurer shall be deemed to have accepted a risk if it has not responded within seven business days after receiving the underwriting information on such risk.  Any renewal of a special acceptance agreed to for a predecessor contract to this Contract, shall automatically be covered hereunder



## ARTICLE VI

## RETENTION AND LIMIT

A.  As respects each excess layer of reinsurance coverage provided by this Contract, the Company shall retain and be liable for the first amount of Ultimate Net Loss, shown as "Company's Per Occurrence Retention" for that excess layer in Schedule A attached hereto, arising out of each Loss Occurrence.  The Reinsurer shall then be liable, as respects each excess layer, for the amount by which such Ultimate Net Loss exceeds the applicable Company's Retention, but the liability of the Reinsurer under each excess shall not exceed the amount shown as "Reinsurer's Per Occurrence Limit" for that excess layer in Schedule A attached hereto, as respects any one Loss Occurrence, nor shall it exceed the amount shown as "Reinsurer's Contract Limit" for that excess layer in Schedule A attached hereto, as respects all loss or losses arising out of Loss Occurrences commencing during the Term of this Contract.

B.  In addition to and after satisfaction of the retention for the First Excess Layer as set forth in Schedule A attached hereto, the Company shall retain an annual aggregate retention of $9,000,000 of Ultimate Net Loss that would otherwise be recoverable under the First Excess Layer.  Coverage under the First Excess Layer shall apply once said annual aggregate retention is satisfied.

C.  No claim shall be made under any excess layer of reinsurance coverage provided by this Contract in any one Loss Occurrence unless at least two risks insured or reinsured by the Company are involved in such Loss Occurrence.  For purposes hereof, the Company shall be the sole judge of what constitutes "one risk."

## ARTICLE VII

## REINSTATEMENT

A.  In the event all or any portion of the reinsurance under any excess layer of reinsurance coverage provided by this Contract is exhausted by Ultimate Net Loss, the amount so exhausted shall be reinstated immediately from the time the Loss Occurrence commences hereon.  For each amount so reinstated the Company shall pay additional premium equal to the product of the following:

1.  The percentage of the occurrence limit for the excess layer reinstated (based on the Ultimate Net Loss paid by the Reinsurer under that excess layer); multiplied by

2.  The reinsurance premium (as calculated according to the provisions of the Reinsurance Premium Article) for the excess layer reinstated for the Term of this Contract (exclusive of reinstatement premium).

B.  Whenever the Company requests payment by the Reinsurer of any Ultimate Net Loss under any excess layer hereunder, the Company shall submit a statement to the Reinsurer of reinstatement premium due the Reinsurer for that excess layer.  If the reinsurance premium for any excess layer for the Term of this Contract has not been finally determined as of the date of any such statement, the calculation of reinstatement premium due for that excess



layer shall be based on the Annual Deposit Premium for that excess layer and shall be readjusted when the reinsurance premium for that excess layer for the Term of this Contract has been finally determined.  Any reinstatement premium shown to be due the Reinsurer for any excess layer as reflected by any such statement (less prior payments, if any, for that excess layer) shall be payable by the Company concurrently with payment by the Reinsurer of the Requested Ultimate Net Loss for that excess layer.  Any return reinstatement premium shown to be due the Company shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the Company's statement.

C.   Notwithstanding anything stated herein, the liability of the Reinsurer for Ultimate Net Loss under any excess layer of reinsurance coverage provided by this Contract shall not exceed either of the following:

1.   The amount, shown as "Reinsurer's Per Occurrence Limit" for that excess layer in Schedule A attached hereto, as respects loss or losses arising out of any one Loss Occurrence; or

2.   The amount, shown as "Reinsurer's Contract Limit" for that excess layer in Schedule A attached hereto, in all during the Term of this Contract.

## ARTICLE VIII

## REINSURANCE PREMIUM

A.   As premium for each excess layer of reinsurance coverage provided by this Contract, the Company shall pay the Reinsurer the greater of the following:

1.   The amount shown as "Annual Minimum Premium" for that excess layer in Schedule A attached hereto (or a pro rata portion thereof in the event the Term of this Contract is less than 12 months); or

2.   The percentage, shown as "Exposure Rate" for that excess layer in Schedule A attached hereto, multiplied by the Company's Total Insured Value with respect to business covered hereunder.

B.   The Company shall pay the Reinsurer an annual deposit premium for each excess layer of the amount shown as "Annual Deposit Premium" for that excess layer in Schedule A attached hereto, in four equal installments of the amount, shown as "Deposit Premium Installment" for that excess layer in Schedule A attached hereto, on July 1 and October 1 of 2023, and January 1 and April 1 of 2024.  However, in the event this Contract is terminated, no deposit premium installments shall be due after the effective date of termination.

C.   If the Company elects to terminate a Reinsurer's participation percentage in accordance with the Special Termination Article, the reinsurance premium due the Reinsurer hereunder (including any minimum reinsurance premium) shall be prorated based on the period of the Reinsurer's participation hereon, and the Reinsurer shall immediately return any excess reinsurance premium received.



D.  Within 60 days following the expiration of this Contract, the Company shall provide the Reinsurer with a report showing the Company's Total Insured Value and the premium due hereunder for each excess layer, computed in accordance with paragraph A above.  Any additional premium due the Reinsurer or return premium due the Company for each such excess layer shall be remitted promptly.

E.  "Totally Insured Value" means the Company's total insured value for exposures retained from the in-force portfolio as of September 30, 2023, for business covered hereunder.

## ARTICLE IX

## DEFINITIONS

A.  Act of Terrorism

"Act of Terrorism" shall mean any act, or preparation in respect of action, or threat of action designed to influence the government de jure or de facto of any nation or any political division thereof, or in pursuit of political, religious, ideological, or similar purposes to intimidate the public or a section of the public of any nation by any person or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s) de jure or de facto, and which:

1.  Involves violence against one or more persons; or

2.  Involves damage to property; or

3.  Endangers life other than that of the person committing the action; or

4.  Creates a risk to the health or safety of the public or a section of the public; or

5.  Is designed to interfere with or disrupt an electronic system.

B.  Loss Adjustment Expense

"Loss Adjustment Expense" shall mean all costs and expenses allocable to a specific claim that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense and/or appeal of a specific claim or loss, or alleged loss, including but not limited to:

1.  Court costs;

2.  Costs of supersedeas and appeal bonds;

3.  Monitoring counsel expenses;

4.  Legal expenses and costs incurred in connection with coverage questions and legal actions connected thereto, including but not limited to declaratory judgment actions;

5.  Pre-judgment and post-judgment interest;



6.  Expenses and a pro rata share of salaries of Company employees, calculated in accordance with the time occupied in adjusting such loss, and expenses of other Company employees who have been temporarily diverted from their normal and customary duties and assigned to the adjustment of losses covered by this Contract; and

7.  Subrogation, salvage and recovery expenses.

Loss Adjustment Expense does not include salaries and expenses of the Company's employees, except as provided in subparagraph B.6. above, and existing office and other overhead expenses incurred.

C.  Extra Contractual Obligations / Loss in Excess of Policy Limits

1.  "Loss in Excess of Policy Limits" as used herein shall mean 90.0% of any amount paid or payable by the Company in excess of its Policy limits, but otherwise within the terms of its Policy, such loss in excess of the Company's Policy limits having been incurred because of, but not limited to, failure by the Company to settle within the Policy limits or by reason of the Company's actual gross negligence or fraud, where such gross negligence or fraud was determined pursuant to a final adjudication by a court of competent jurisdiction, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of an action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such an action determined pursuant to a final adjudication of a court of competent jurisdiction.

2.  "Extra Contractual Obligations" as used herein shall mean 90.0% of any punitive, exemplary, compensatory or consequential damages paid or payable by the Company, not covered by any other provision of this Contract and which arise from the handling of any claim on business subject to this Contract, such liabilities arising because of, but not limited to, failure by the Company to settle within the Policy limits or by reason of the Company's actual gross negligence or fraud, where such gross negligence or fraud was determined pursuant to a final adjudication by a court of competent jurisdiction, or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of an action against its insured or reinsured or in the preparation or prosecution of an appeal consequent upon such an action determined pursuant to a final adjudication by a court of competent jurisdiction.  An Extra Contractual Obligation shall be deemed, in all circumstances, to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

Notwithstanding anything stated herein, this Contract shall not apply to any Loss in Excess of Policy Limits or any Extra Contractual Obligation incurred by the Company as a result of any fraudulent and/or criminal act (as determined by a court of competent jurisdiction) by any officer or director of the Company acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.



D.    Policy

"Policy" as used herein shall mean any binder, policy, endorsement, or contract of insurance or reinsurance issued, accepted or held covered provisionally or otherwise, by or on behalf of the Company.  "Policies" as used herein shall mean more than one Policy.

E.    Term of this Contract

"Term of this Contract" as used herein shall mean the period from 12:00:01 a.m., Local Time, June 1, 2023, to 12:00:01 a.m., Local Time, June 1, 2024.  However, if this Contract is terminated, "Term of this Contract" as used herein shall mean the period from 12:00:01 a.m., Local Time, June 1, 2023, to the effective time and date of termination.

F.    Runoff Reinsurer

"Runoff Reinsurer" as used herein shall mean a Subscribing Reinsurer that experiences one or more of the following circumstances:

1.    A State Insurance Department or other legal authority has ordered the Subscribing Reinsurer to cease writing business; or

2.    The Subscribing Reinsurer has become insolvent or has been placed into liquidation, receivership, supervision, administration, winding-up or under a scheme of arrangement, or similar proceedings (whether voluntary or involuntary) or proceedings have been instituted against the Subscribing Reinsurer for the appointment of a receiver, liquidator, rehabilitator, supervisor, administrator, conservator or trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of its operations; or

3.    The Subscribing Reinsurer has reinsured its entire liability under this Contract without the Company's prior written consent; or

4.    The Subscribing Reinsurer has ceased assuming new or renewal property or casualty treaty reinsurance business; or

5.    The Subscribing Reinsurer has transferred its claims-paying authority to an unaffiliated entity.

G.    Ultimate Net Loss

"Ultimate Net Loss" as used herein shall mean the sum or sums (including Loss in Excess of Policy Limits, Extra Contractual Obligations and Loss Adjustment Expense, as used herein defined) paid or payable by the Company in settlement of claims and in satisfaction of judgments rendered on account of such claims, after deduction of all salvage and all recoveries (including recoveries of all claims on inuring reinsurance, whether collectible or not).  Nothing herein shall be construed to mean that losses under this Contract are not recoverable until the Ultimate Net Loss has been ascertained.



## ARTICLE X

## OTHER REINSURANCE

A. The Company shall be permitted to maintain in force excess of loss and quota share reinsurance, recoveries under which shall inure to the benefit of this Contract.

B. The Company shall be permitted to carry in force underlying excess of loss, quota share, accident year stop loss and excess catastrophe reinsurance, recoveries under which shall inure solely to the benefit of the Company and be entirely disregarded in applying all of the provisions of this Contract.

## ARTICLE XI

## LOSS OCCURRENCE

A. The term "Loss Occurrence" as used herein shall mean the sum of all individual losses directly occasioned by any one disaster, accident or loss or series of disasters, accidents or losses arising out of one event which occurs within the area of one state of the United States or province of Canada and states or provinces contiguous thereto and to one another. However, the duration and extent of any one Loss Occurrence shall be limited to all individual losses sustained by the Company occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event, except that the term Loss Occurrence shall be further defined as follows:

1. As regards any Named Storm, all individual losses sustained by the Company arising out of and directly occasioned by such Named Storm, without regard to the limitations of duration and extent set forth above, shall be included in the Loss Occurrence. "Named Storm" means any storm or storm system declared by the U.S. National Hurricane Center, U.S. Central Pacific Hurricane Center, U.S. Weather Prediction Center, or their successor organizations, all being divisions of the U.S. National Weather Service, to be a tropical storm or hurricane, including any precursor(s) and successor(s) thereof. A storm or storm system that merges with a Named Storm shall be considered part of that Named Storm. A Named Storm shall be deemed to begin at the effective time and date of the first watch, warning or other official advisory applicable to such tropical storm, or hurricane, issued by the above referenced governmental meteorological agencies. A Named Storm shall be deemed to end 72 hours after the cancellation of the last watch, warning or other official advisory applicable to such tropical storm, hurricane or successor, issued by the above referenced governmental meteorological agencies irrespective of the duration of the timing or spacing between such watches, warnings or other official advisories. For the avoidance of doubt, the event need not be limited to one state or province or states or provinces contiguous thereto.

2. As regards windstorm, hail, tornado and cyclone (other than as provided for in subparagraph 1 above), including ensuing collapse and water damage, all individual losses sustained by the Company occurring during any period of no longer than 96 consecutive hours arising out of and directly occasioned by the same event.



However, the event need not be limited to one state or province or states or provinces contiguous thereto.

3.  As regards riot, riot attending a strike, civil commotion, vandalism and malicious mischief, all individual losses sustained by the Company occurring during any period of 96 consecutive hours within the area of one municipality or county and the municipalities or counties contiguous thereto arising out of and directly occasioned by the same event.  Notwithstanding the foregoing, as regards coordinated organized activities that together have a common cause and that occur within the geographical scope of this Contract, all individual losses sustained by the Company during any period of 96 consecutive hours may be included in the Company's "Loss Occurrence." The maximum duration of 96 consecutive hours may be extended in respect of individual losses which occur beyond such 96 consecutive hours during the continued occupation of an insured's premises by strikers, provided such occupation commenced during the aforesaid period.

4.  As regards earthquake (the epicenter of which need not necessarily be within the territorial confines referred to in the introductory portion of paragraph A of this Article) and fire following directly occasioned by the earthquake, only those individual fire losses which commence during the period of 168 consecutive hours may be included in the Company's Loss Occurrence.

5.  As regards freeze, only individual losses directly occasioned by collapse, breakage of glass and water damage (caused by bursting frozen pipes and tanks) may be included in the Company's Loss Occurrence.

6.  As regards firestorms, brush fires and any other fires or series of fires, irrespective of origin (except as provided in subparagraphs A.1.c and A.1.d above), all individual losses sustained by the Company which commence during any period of 168 consecutive hours within the area of one state of the United States or province of Canada and states or provinces contiguous thereto and to one another may be included in the Company's Loss Occurrence.

B.  Except as provided in subparagraph A.1. above:

1.  The Company may choose the date and time when any such period of consecutive hours commences provided that it is not earlier than the date and time of the occurrence of the first recorded individual loss sustained by the Company arising out of that disaster, accident or loss.

2.  Only one period of consecutive hours shall apply with respect to one event, except that, as respects those Loss Occurrences referred to in subparagraphs A.2. and A.3. above, if the disaster, accident or loss occasioned by the event is of greater duration than 96 consecutive hours, then the Company may divide that disaster, accident or loss into two or more Loss Occurrences provided no two periods overlap and no individual loss is included in more than one such period and provided that no period commences earlier than the date and time of the occurrence of the first recorded individual loss sustained by the Company arising out of that disaster, accident or loss.



C.    Losses arising from a combination of two or more perils as a result of the same event shall be considered as having arisen from one Loss Occurrence. Furthermore, all losses arising from an event involving a combination of losses described in subparagraphs A.1. and A.2. may be considered as having arisen from one Loss Occurrence. Notwithstanding the foregoing, the hourly limitations as stated above shall not be exceeded as respects the applicable perils, and, except as respects those Loss Occurrences involving a Named Storm referred to in subparagraph A.1. above, no single Loss Occurrence shall encompass a time period greater than 168 consecutive hours.

## **ARTICLE XII**

## **FHCF AND RAP LOSS REIMBURSEMENT**

A.    As respects Loss Occurrences subject to this Contract, any loss reimbursement recoverable by the Company under the Reinsurance to Assist Policyholders program ("RAP") and/or the Florida Hurricane Catastrophe Fund ("FHCF") shall be deducted in determining the Ultimate Net Loss under this Contract, subject to the following:

1.    The full reimbursement amount due from the RAP and/or FHCF for coverage under any applicable mandatory layer, based on statutory limits of coverage as of June 1, 2023, shall be deemed recovered by the Company, whether or not actually received from the RAP and/or FHCF and whether or not reduced because of the RAP's and/or FHCF's inability to pay.

2.    For purposes of allocating recoveries from the RAP and/or FHCF with respect to each Loss Occurrence, only amounts recoverable by applying the pay-out and retention multiples for the RAP and/or FHCF prior to any reduction in retention due to multiple Loss Occurrences in the same annual period shall be included in calculating the deduction from Ultimate Net Loss.

3.    If the Company's aggregate limit of RAP and/or FHCF reimbursement coverage is exhausted from Loss Occurrences commencing during the term of this Contract, and the RAP and/or FHCF does not designate the portion of said limit allocable to each Loss Occurrence that exhausted such coverage, the total RAP and/or FHCF reimbursement received shall be allocated to each such individual Loss Occurrence in the proportion of the Company's losses in that Loss Occurrence bear to the Company's total losses arising out of all such Loss Occurrences.

B.    For purposes of loss recoveries under this Contract, prior to the final determination of the Company's retention(s) and limit(s) under the RAP and/or FHCF, RAP and/or FHCF coverage shall be calculated using the Company's "Projected Payout Multiple" under the RAP and/or FHCF. Upon determination of the Company's retention(s) and limit(s) under the RAP and/or FHCF, losses shall be adjusted, recognizing any adjustment to the "Projected Payout Multiple" caused by a change in any aggregate mandatory premium, but disregarding any change due to a decrease in the statutory limit.



## ARTICLE XIII

### ACCESS TO RECORDS

The Reinsurer or its duly authorized representatives shall have the right to visit the offices of the Company, or at the Company's option, shall have the right to virtually obtain access, to inspect, examine, audit, and verify any of the Policy, accounting or claim files relating to business reinsured under this Contract during regular business hours after giving five working days' prior notice.  This right shall be exercisable during the Term of this Contract or after the Expiration of this Contract.  Notwithstanding the above, the Reinsurer shall not have any right of access to the records of the Company if it is not current in all Undisputed Payments due the Company.  "Undisputed Payments" as used herein shall mean any amounts that the Reinsurer has not contested in writing to the Company specifying the reason(s) why the payments are disputed.

## ARTICLE XIV

### AGENCY

If more than one reinsured company is named as a party to this Contract, the first named company shall be deemed the agent of the other reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Contract, and for purposes of remitting or receiving any monies due any party.

## ARTICLE XV

### ARBITRATION

A.   As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising with respect to this Contract, (including, without limitation, disputes concerning the formation or validity of this Contract), it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.  One Arbiter shall be chosen by the Company, the other by the Reinsurer, and an Umpire shall be chosen by the two Arbiters before they enter upon arbitration, all of whom shall be active or retired disinterested executive officers of insurance or reinsurance companies or Lloyd's London Underwriters.  In the event that either party should fail to choose an Arbiter within 30 days following a written request by the other party to do so, the requesting party may choose two Arbiters who shall in turn choose an Umpire before entering upon arbitration.  If the two Arbiters fail to agree upon the selection of an Umpire within 30 days following their appointment, each Arbiter shall nominate three candidates within 10 days thereafter, two of whom the other shall decline, and the decision shall be made by drawing lots.

B.   Each party shall present its case to the Arbiters within 30 days following the date of appointment of the Umpire.  The Arbiters shall consider this Contract as an honorable engagement rather than merely as a legal obligation and they are relieved of all judicial formalities and may abstain from following the strict rules of law.  The decision of the Arbiters shall be final and binding on both parties; but failing to agree, they shall call in the Umpire and the decision of the majority shall be final and binding upon both parties.



Judgment upon the final decision of the Arbiters may be entered in any court of competent jurisdiction.

C.  If more than one reinsurer is involved in the same dispute, all such reinsurers shall, at the option of the Company, constitute and act as one party for purposes of this Article and communications shall be made by the Company to each of the reinsurers constituting one party, provided; however, that nothing herein shall impair the rights of such reinsurers to assert several, rather than joint, defenses or claims, nor be construed as changing the liability of the reinsurers participating under the terms of this Contract from several to joint.

D.  Each party shall bear the expense of its own Arbiter, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration.  In the event that the two Arbiters are chosen by one party, as above provided, the expense of the Arbiters, the Umpire and the arbitration shall be equally divided between the two parties.

E.  Any arbitration proceedings shall take place in the State of Florida, at a location mutually agreed upon by the parties to this Contract, and shall be governed by the law of the State of Florida.

F.  Notwithstanding the above, in the event the dispute or difference of opinion involves a Runoff Reinsurer, the Company may, at its option, choose to forego arbitration and may bring an action in any court of competent jurisdiction.

## **ARTICLE XVI**

## **CONFIDENTIALITY**

A.  The Reinsurer hereby acknowledges that the documents, information, and data provided to it by the Company, whether directly or through an authorized agent, in connection with the placement and execution of this Contract, including all information obtained through any audits and any claims information between the Company and the Reinsurer, and any submission or other materials relating to any renewal (hereinafter referred to as "Confidential Information") are proprietary and confidential to the Company.  Confidential Information shall not include documents, information or data that the Reinsurer can show:

1.  Are publicly available or have become publicly available through no unauthorized act of the Reinsurer;

2.  Have been rightfully received from a third person without obligation of confidentiality; or

3.  Were known by the Reinsurer prior to the placement of this Contract without an obligation of confidentiality.

B.  Absent the written consent of the Company, the Reinsurer shall not disclose any Confidential Information to any third parties, including any affiliated companies (except to the extent necessary to enable affiliated companies or third parties engaged by the Reinsurer to perform services related to this Contract on behalf of the Reinsurer and subject



to their agreement to adhere to the confidentiality provisions as set forth in this Contract), except when required by:

1.  Retrocessionaires subject to the business ceded to this Contract, who must first agree to be bound by the provisions of this Article as if they were the Reinsurer;

2.  Regulators performing an audit of the Reinsurer's records in the normal course of business, who must first agree to be bound by the provisions of this Article as if they were the Reinsurer.

3.  External auditors performing an audit of the Reinsurer's records and/or financial condition; or

With the exception of subparagraphs B.1., B.2., and B.3. above, the Reinsurer agrees not to use any Confidential Information for any purpose not related to the performance of its obligations or enforcement of its rights under this Contract.

"Retrocessionaire" as used in subparagraph B.1. above shall mean any reinsurer assuming business ceded to the Reinsurer under this Contract.

C.  With regard to any personally identifiable information of the insured under the Policy to which the Reinsurer or its representatives may have access, the Reinsurer shall agree to be bound by the insurance privacy laws of Florida and any applicable U.S. federal law and shall keep such information secure in accordance with U.S. insurance industry standards or that of the Reinsurer's country of domicile, whichever standards are higher.

D.  Notwithstanding the above, in the event that the Reinsurer is required by court order, other legal process or any regulatory authority to release or disclose any or all of the Confidential Information, the Reinsurer agrees to provide the Company with written notice of same at least 10 days prior to such release or disclosure and to use its best efforts to assist the Company in maintaining the confidentiality provided for in this Article.

E.  The provisions of this Article shall extend to the officers, directors and employees of the Reinsurer and its affiliates, and shall be binding upon their successors and assigns.

## <u>ARTICLE XVII</u>

## <u>CURRENCY</u>

A.  Whenever the word "dollars" or the "$" sign appears in this Contract, they shall be construed to mean United States dollars and all transactions under this Contract shall be in United States dollars.

B.  Amounts paid or received by the Company in any other currency shall be converted to United States dollars at the rate of exchange at the date such transaction is entered on the books of the Company.



## ARTICLE XVIII

### ENTIRE AGREEMENT

A.    This Contract shall constitute the entire agreement between the parties hereto with respect to the business being reinsured hereunder, and there are no understandings between the parties other than as expressed in this Contract.

B.    Any change or modification to this Contract shall be null and void unless made by amendment to this Contract and signed by the parties hereto. Notwithstanding the foregoing, any special acceptance made in accordance with the provisions of this Contract shall be deemed a part of this Contract.

## ARTICLE XIX

### ERRORS AND OMISSIONS

Inadvertent delays, errors or omissions made in connection with this Contract or any transaction hereunder shall not relieve either party from any liability which would have attached had such delay, error or omission not occurred, provided always that such error or omission is rectified as soon as possible after discovery.

## ARTICLE XX

### FEDERAL EXCISE TAX

A.    The Reinsurer has agreed to allow, for the purpose of paying the federal excise tax, the applicable percentage of the premium payable hereon (as imposed under Section 4371 of the U.S. Internal Revenue Code) to the extent such premium is subject to the federal excise tax.

B.    In the event of any return premium becoming due hereunder, the Reinsurer shall deduct the applicable percentage from the return premium payable hereon and the Company or its agent shall recover such tax from the United States government.

## ARTICLE XXI

### FUNDING OF RESERVES

A.    The Reinsurer agrees to fund its share of the Company's ceded unearned premium (including, but not limited to, the unearned portion of any deposit premium installment as calculated by the Company), known outstanding losses and Loss Adjustment Expense that have been reported to the Reinsurer, losses and Loss Adjustment Expense paid by the Company but not recovered from the Reinsurer, losses incurred but not reported and all other amounts for which the Company cannot take credit on its financial statements unless funding is provided by the Reinsurer (hereinafter referred to as the "Reinsurer's Obligations") by:



1.  Clean, irrevocable and unconditional letter of credit issued and confirmed, if confirmation is required by the insurance regulatory authorities involved, by a bank or banks meeting the NAIC Securities Valuation Office credit standards for issuers of letters of credit and acceptable to the Company and to the Florida Office of Insurance Regulation; and/or

2.  Cash advances; and/or

3.  A trust fund in accordance with the provisions of Florida law and applicable regulations;

if:

i.  The Reinsurer is unauthorized in Florida or is required by the Florida Office of Insurance Regulation to allow the Company to take full credit on its financial statements for reinsurance purchased; or

ii.  The Company is allowed statutory credit for reinsurance ceded to that Reinsurer on the basis of that Reinsurer having satisfied the conditions pertaining to Reciprocal Jurisdictions as required by Florida regulation, and that Reinsurer resists enforcement of a final judgment that is enforceable under the law of the jurisdiction in which it was obtained or a properly enforceable arbitration award, whether obtained by the ceding insurer or by its legal successor on behalf of its resolution estate; or

iii.  The Reinsurer has experienced any of the circumstances described in paragraph A of the Special Termination Article.  However, if such circumstance is rectified, then no special funding requirements shall apply and any such current funding in accordance with the provisions above shall be released to the Reinsurer.

For purposes of this Contract, the Lloyd's United States Credit for Reinsurance Trust Fund shall be considered an acceptable funding instrument.  The Reinsurer, at its sole option, may fund in other than cash if its method and form or funding are acceptable to the Company and to the insurance regulatory authorities involved.  As respects funding required pursuant to subparagraph A(ii) above, the Reinsurer shall secure 100% of the Reinsurer's share of the Reinsurer's Obligations under this Contract.

Notwithstanding the provisions of the Arbitration Article, if a Runoff Reinsurer fails to fund its share of the Company's ceded unearned premium (including, but not limited to, the unearned portion of any deposit premium installment as calculated by the Company), known outstanding losses and Loss Adjustment Expense that have been reported to the Reinsurer, losses and Loss Adjustment Expense paid by the Company but not recovered from the Reinsurer, losses incurred but not reported and all other amounts for which the Company cannot take credit on its financial statements unless funding is provided by the Reinsurer under this Contract as set forth above, the Company retains its right to apply to a court of competent jurisdiction for equitable or interim relief.

B.  With regard to funding in whole or in part by letter of credit, it is agreed that each letter of credit shall be in a form acceptable to the Company, shall be subject to and governed by the



laws of the State of Florida, shall be issued for a term of at least one year, and shall include an "evergreen clause," which automatically extends the term for at least one additional year at each expiration date unless written notice of non-renewal is given to the Company not less than 60 days prior to said expiration date.

C.   The Company and the Reinsurer further agree, notwithstanding anything to the contrary in this Contract, that any funding provided by the Reinsurer may be drawn upon by the Company or its successor(s) by operation of law, including without limitation any liquidator, rehabilitator, receiver or conservator and if a court appoints a successor in interest, then the court appointed domiciliary receiver, including conservator, rehabilitator or liquidator, without diminution because of the insolvency of the Company or the Reinsurer, but only for one or more of the following purposes:

1.   To reimburse itself for the Reinsurer's share of losses and/or Loss Adjustment Expense paid under the terms of Policies reinsured hereunder, unless paid in cash by the Reinsurer;

2.   To reimburse itself for the Reinsurer's share of any other amounts claimed to be due hereunder, unless paid in cash by the Reinsurer;

3.   To fund a cash account in an amount equal to the Reinsurer's share of any ceded unearned premium (including, but not limited to, the unearned portion of any deposit premium installment as calculated by the Company), known outstanding losses and Loss Adjustment Expense that have been reported to the Reinsurer, losses and Loss Adjustment Expense paid by the Company but not recovered from the Reinsurer, losses incurred but not reported and all other amounts for which the Company cannot take credit on its financial statements unless funding is provided by the Reinsurer, if said letter of credit shall expire without renewal or be reduced or replaced by a letter of credit for a reduced amount and where the Reinsurer's obligation under the Contract remains unliquidated and discharged 10 days prior to its termination or expiration date;

4.   To refund to the Reinsurer any sums in excess of the actual amount required to fund the Reinsurer's share of the Company's ceded unearned premium (including, but not limited to, the unearned portion of any deposit premium installment as calculated by the Company), known outstanding losses and Loss Adjustment Expense that have been reported to the Reinsurer, losses and Loss Adjustment Expense paid by the Company but not recovered from the Reinsurer, losses incurred but not reported and all other amounts for which the Company cannot take credit on its financial statements unless funding is provided by the Reinsurer, if so requested by the Reinsurer; and

5.   To reimburse itself for the Reinsurer's portion of the unearned reinsurance premium paid to the Reinsurer hereunder.

In the event the amount drawn by the Company on any funding provided by the Reinsurer is in excess of the actual amount required for subparagraphs C.1. or C.3. above, or in the



case of subparagraph C.2. above, the actual amount determined to be due, the Company shall promptly return to the Reinsurer the excess amount so drawn.

D.   The issuing bank shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Company or the disposition of funds withdrawn, except to ensure that withdrawals are made only upon the order of properly authorized representatives of the Company.

E.   At annual intervals, or more frequently at the discretion of the Company, but never more frequently than quarterly, the Company shall prepare a specific statement of the Reinsurer's funding obligations for the sole purpose of amending the letter of credit or other method of funding, in the following manner:

1.   If the statement shows that the Reinsurer's funding obligations exceed the balance of the letter of credit as of the statement date, the Reinsurer shall, within 30 days after receipt of the statement, secure delivery to the Company of an amendment to the letter of credit increasing the amount of credit by the amount of such difference. Should another method of funding be used, the Reinsurer shall, within the time period outlined above, increase such funding by the amount of such difference.

2.   If however, the statement shows that the Reinsurer's funding obligations are less than the balance of the letter of credit (or that 102% of the Reinsurer's funding obligations are less than the trust account balance if funding is provided by a Trust Agreement) as of the statement date, the Company shall, within 30 days after receipt of written request from the Reinsurer, release such excess credit available by the amount of such excess credit.  Should another method of funding be used, the Reinsurer shall, within the time period outlined above, decrease such funding by the amount of such excess.

F.   If the Reinsurer fails to fulfill its funding obligation, if any, under this Article, the Company may, at its option, require the Reinsurer to pay, and the Reinsurer agrees to pay, an interest charge on the funding obligation calculated on the last business day of each month as follows:

1.   The number of full days that have expired since the earliest of the applicable following dates:

a.   As respects a Subscribing Reinsurer that is unauthorized in Florida or is required by the Florida Office of Insurance Regulation to allow the Company to take full credit on its financial statements for reinsurance purchased, December 31 of the calendar year in which the funding was required;

b.   As respects a Subscribing Reinsurer that is required to fund due to the Subscribing Reinsurer experiencing any of the circumstances described in paragraph A of the Special Termination Article, the first date the circumstance triggering the Company's option to require funding occurs;

multiplied by:



2.   1/365th of the sum of 3.0% and the U.S. prime rate as quoted in *The Wall Street Journal* on the first day of the month for which the calculation is made; multiplied by

3.   The greater of (a) the funding obligation, less the amount, if any, funded by the Reinsurer prior to the applicable date determined in subparagraph E.1. above or (b) $500.

It is agreed that interest shall accumulate until the full interest charge amount as provided for in this paragraph E and the funding obligation are paid.

If the interest rate provided under this Article exceeds the maximum interest rate allowed by any applicable law or is held unenforceable by an arbitrator or a court of competent jurisdiction, such interest rate shall be modified to the highest rate permitted by the applicable law, and all remaining provisions of this Article and Contract shall remain in full force and effect without being impaired or invalidated in any way.

## ARTICLE XXII

**GOVERNING LAW**

This Contract shall be governed by and construed in accordance with the laws of the State of Florida.

## ARTICLE XXIII

**INSOLVENCY**

A.   If more than one company is included with the definition of "Company" hereunder, this Article shall apply individually to each such company.

B.   In the event of the insolvency of one or more of the reinsured companies, this reinsurance shall be payable directly to the Company or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim.  It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company indicating the Policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.



C.   Where two or more reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of this Contract as though such expense had been incurred by the Company.

D.   It is further understood and agreed that, in the event of the insolvency of one or more of the reinsured companies, the reinsurance under this Contract shall be payable directly by the Reinsurer to the Company or its liquidator, receiver or statutory successor, except (1) where this Contract specifically provides payment to the named insured, assignee, or named beneficiary of the Policy, or (2) where the Reinsurer with the consent of the direct insured or insureds has assumed the Policy obligations of the Company as direct obligations of the Reinsurer to the named insured.

## ARTICLE XXIV

## LATE PAYMENTS

A.   The provisions of this Article shall not be implemented unless specifically invoked, in writing, by one of the parties to this Contract.

B.   In the event any premium, loss or other payment due either party is not received by the intermediary named in the Intermediary Article (hereinafter referred to as the "Intermediary") by the payment due date, the party to whom payment is due may, by notifying the Intermediary in writing, require the debtor party to pay, and the debtor party agrees to pay, an interest charge on the amount past due calculated for each such payment on the last business day of each month as follows:

1.   The number of full days which have expired since the due date or the last monthly calculation, whichever the lesser; multiplied by

2.   $1/365^{th}$ of the sum of 3.0% and the U.S. prime rate as quoted in *The Wall Street Journal* on the first business day of the month for which the calculation is made; times

3.   The amount past due, including accrued interest.

It is agreed that interest shall accumulate until payment of the original amount due plus interest charges have been received by the Intermediary.

Notwithstanding the provisions of subparagraph B.2. above and the immediately preceding sentence, the interest rate for a Runoff Reinsurer shall increase by 1.0 percentage point for every month that payment of the claim is past due, subject to a maximum annual interest rate of 12.0%

C.   If the interest rate provided under this Article exceeds the maximum interest rate allowed by any applicable law or is held unenforceable by an arbitrator or a court of competent jurisdiction, such interest rate shall be modified to the highest rate permitted by the applicable law, and all remaining provisions of this Article and Contract shall remain in full force and effect without being impaired or invalidated in any way.



D.   The establishment of the due date shall, for purposes of this Article, be determined as follows:

    1.   As respect the payment of routine deposits and premiums due the Reinsurer, the due date shall be as provided for in the applicable section of this Contract.  In the event a due date is not specifically stated for a given payment, it shall be deemed due 30 days after the date of transmittal by the Intermediary of the initial billing for each such payment.

    2.   Any claim or loss payment due the Company hereunder shall be deemed due 30 days after the proof of loss or demand for payment is transmitted to the Reinsurer.  If such loss or claim payment is not received within the 30 days, interest shall accrue on the payment or amount overdue in accordance with paragraphs B and C of this Article, from the date the proof of loss or demand for payment was transmitted to the Reinsurer.

    3.   As respects any payment, adjustment or return due either party not otherwise provided for in subparagraphs D.1. and D.2. above, the due date shall be as provided for in the applicable section of this Contract.  In the event a due date is not specifically stated for a given payment, it shall be deemed due 30 days following transmittal of written notification that the provisions of this Article have been invoked.

For purposes of interest calculations only, amounts due hereunder shall be deemed paid upon receipt by the Intermediary.

E.   Nothing herein shall be construed as limiting or prohibiting a Subscribing Reinsurer from contesting the validity of any claim, or from participating in the defense of any claim or suit, or prohibiting either party from contesting the validity of any payment or from initiating any arbitration or other proceeding in accordance with the provisions of this Contract.  If the debtor party prevails in an arbitration or other proceeding, then any interest charges due hereunder on the amount in dispute shall be null and void.  If the debtor party loses in such proceeding, then the interest charge on the amount determined to be due hereunder shall be calculated in accordance with the provisions set forth above unless otherwise determined by such proceedings.  If a debtor party advances payment of any amount it is contesting, and proves to be correct in its contestation, either in whole or in part, the other party shall reimburse the debtor party for any such excess payment made plus interest on the excess amount calculated in accordance with this Article.

F.   Interest charges arising out of the application of this Article that are $500 or less from any party shall be waived unless there is a pattern of late payments consisting or three or more items over the course of any 12-month period.



## ARTICLE XXV

**LIABILITY OF THE REINSURER**

A.   The liability of the Reinsurer shall follow that of the Company in every case and be subject in all respects to all the general and specific stipulations, clauses, waivers, interpretations and modifications of the Policies and any endorsements thereon.  However, in no event shall this be construed in any way to provide coverage outside the terms and conditions set forth in this Contract.

B.   No person, other than the Company, has any rights against the Reinsurer which are not specifically set forth in this Contract or in a specific written, signed agreement between the Reinsurer and the person.

## ARTICLE XXVI

**LOSS NOTICES AND SETTLEMENTS**

A.   Whenever losses are reserved by the Company for an amount equal to or greater than 50.0% of the Company's Retention hereunder and/or whenever losses sustained by the Company appear likely to result in a claim hereunder, the Company shall notify the Reinsurer.  Inadvertent omission in dispatching the aforementioned notices shall in no way affect the obligation of the Reinsurer under this Contract, provided the Company informs the Reinsurer of such omission promptly upon discovery.

B.   All loss settlements made by the Company, provided they are within the terms of this Contract or by way of compromise, shall be binding upon the Reinsurer, and the Reinsurer agrees to pay all amounts for which it may be liable upon receipt of reasonable evidence of the amount paid (or scheduled to be paid within 30 days) by the Company.

C.   As respects any payment due from a Runoff Reinsurer, the following shall apply:

   1.   If the Runoff Reinsurer does not pay a claim or specify in writing to the Company the reason(s) for its dispute of a claim within 30 days of billing, it shall not be allowed to deny such claim and must pay immediately.

   2.   A Runoff Reinsurer shall not have the right to deny payment of a claim under any excess layer if the sum of the percentage shares of Active Reinsurers that have paid the claim under that excess layer exceeds 50.0% of the sum of the percentage shares of all Active Reinsurers participating on that excess layer.  "Active Reinsurer" as used herein shall mean a Reinsurer that is not a Runoff Reinsurer as of the due date of the claim (as specified in the Late Payments Article).  Further, a Runoff Reinsurer shall not have the right to hire a runoff claims manager that is compensated on a contingent basis or is otherwise provided with financial incentives based on the quantum of claims paid, as respects the Runoff Reinsurer's share of any claims payable under this Contract.



## ARTICLE XXVII

**NET RETAINED LINES**

A.  This Contract applies only to that portion of any loss that the Company retains net for its own account (prior to deduction of the Company's quota share and/or any other reinsurance that inures solely to the benefit of the Company).

B.  The amount of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other reinsurer(s), whether specific or general, any amounts which may have become due from such reinsurer(s), whether such inability arises from the insolvency of such other reinsurer(s) or otherwise.

## ARTICLE XXVIII

**NON-WAIVER**

The failure of the Company or the Reinsurer to insist on compliance with this Contract or to exercise any right or remedy hereunder shall not constitute a waiver of any rights contained in this Contract nor prevent either party from thereafter demanding full and complete compliance nor prevent either party from exercising such right or remedy in the future.

## ARTICLE XXIX

**NOTICES AND CONTRACT EXECUTION**

A.  Whenever a notice, statement, report or any other written communication is required by this Contract, unless otherwise specified, such notice, statement, report or other written communication may be transmitted by certified or registered mail, nationally or internationally recognized express delivery service, personal delivery, electronic mail, or facsimile.  With the exception of notices of termination, first class mail is also acceptable.

B.  The use of any of the following shall constitute a valid execution of this Contract or any amendments thereto:

    1.  Paper documents with an original ink signature;

    2.  Facsimile or electronic copies of paper documents showing an original ink signature; and/or

    3.  Electronic records with an electronic signature made via an electronic agent.  For the purposes of this Contract, the terms "electronic record," "electronic signature" and "electronic agent" shall have the meanings set forth in the Electronic Signatures in Global and National Commerce Act of 2000 or any amendments thereto.

C.  This Contract may be executed in one or more counterparts, each of which, when duly executed, shall be deemed an original.



## ARTICLE XXX

**OFFSET**

A.   The Company and the Reinsurer shall have the right to offset any balance or amounts due from one party to the other under the terms of this Contract.  The party asserting the right of offset may exercise such right any time whether the balances due are on account of premiums or losses or otherwise.  However, in the event of the insolvency of a party hereto, offset shall only be allowed in accordance with applicable statutes and regulations.

B.   Notwithstanding the provisions of paragraph A of this Article, a Runoff Reinsurer shall not offset balances as outlined above without the prior consent of the Company.

## ARTICLE XXXI

**SALVAGE AND SUBROGATION**

The Reinsurer shall be credited with salvage (i.e., reimbursement obtained or recovery made by or on behalf of the Company, less the actual cost, excluding salaries of officials and employees of the Company, of obtaining such reimbursement or making such recovery) on account of claims and settlements involving reinsurance hereunder.  Salvage thereon shall always be used to reimburse the excess carriers in the reverse order of their priority according to their participation before being used in any way to reimburse the Company for its primary loss.  The Company hereby agrees to enforce its rights to salvage or subrogation relating to any loss, a part of which loss was sustained by the Reinsurer, and to prosecute all claims arising out of such rights if, in the Company's opinion, it is economically reasonable to do so.

## ARTICLE XXXII

**SANCTIONS**

Neither the Company nor any Subscribing Reinsurer shall be liable for premium or loss under this Contract if it would result in a violation of any mandatory sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America that are applicable to either party.

## ARTICLE XXXIII

**SERVICE OF SUIT**

(This Article is applicable if the Reinsurer is not domiciled in the United States of America and/or is not authorized in any State, Territory, or District of the United States where authorization is required by insurance regulatory authorities.  This Article is not intended to conflict with or override the obligation of the parties to arbitrate their disputes in accordance with the ARBITRATION ARTICLE.)

A.   In the event of the failure of the Reinsurer to perform its obligations under this Contract, the Reinsurer, at the request of the Company, shall submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this Article constitutes or



should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  The Reinsurer, once the appropriate court is selected, whether such court is the one originally chosen by the Company and accepted by the Reinsurer or is determined by removal, transfer, or otherwise, as provided for above, shall comply with all requirements necessary to give said court jurisdiction and, in any suit instituted against it upon this Contract, and shall abide by the final decision of such court or of any appellate court in the event of an appeal.  The validity and/or enforceability of any arbitration award or judgment obtained in the United States shall not be contested by the Reinsurer in any jurisdiction outside of the United States.

B.   Service of process in such suit may be made upon the law firm of Mendes and Mount, 750 Seventh Avenue, New York, NY 10019, or another party specifically designated by the Reinsurer in its Interests and Liabilities Agreement attached hereto. As respects Lloyd's underwriters, service of process shall be made upon Lloyd's America, Attention: Legal Department, 280 Park Avenue, East Tower, 25th Floor, New York, NY 10017.

C.   Further, pursuant to any statute of the State of Florida, the Reinsurer hereby designates the party named in its Interests and Liabilities Agreement, or if no party is named therein, the Chief Financial Officer of the State of Florida or other governmental agency or regulator specified by law, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Contract, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## ARTICLE XXXIV

**SEVERABILITY**

If any provision of this Contract shall be rendered illegal or unenforceable by the laws, regulations or public policy of any state, such provision shall be considered void in such state, but this shall not affect the validity or enforceability of any other provision of this Contract or the enforceability of such provision in any other jurisdiction.

## ARTICLE XXXV

**TAXES**

In consideration of the terms under which this Contract is issued, the Company shall not claim a deduction in respect of the premium hereon when making tax returns, other than income or profits tax returns, to any state or territory of the United States of America or the District of Columbia.



## ARTICLE XXXVI

### INTERMEDIARY

Gallagher Re Inc. is hereby recognized as the intermediary negotiating this Contract and through whom all communications relating thereto shall be transmitted to the Company or the Reinsurer. Payments by the Company to Gallagher Re Inc. shall be deemed to constitute payment to the Reinsurer and payments by the Reinsurer to Gallagher Re Inc. shall be deemed to constitute payment to the Company only to the extent that such payments are actually received by the Company. Gallagher Re Inc., a New York corporation, operates in California and Pennsylvania as Gallagher Re Insurance Services (California License Number OBO1804).

**IN WITNESS WHEREOF,** the Company by its duly authorized representative has executed this Contract as of the date specified below:

Signed this _____ 13 _____ day of _____ July _____ , 20 23 .

**OLYMPUS INSURANCE COMPANY**

By _____

Printed Name _____ Timothy Stroble _____

Title _____ CEO _____



**SCHEDULE A**

**PROPERTY CATASTROPHE EXCESS OF LOSS**
**REINSURANCE CONTRACT**
**Effective:  June 1, 2023**

**OLYMPUS INSURANCE COMPANY**
**Jacksonville, Florida**

|  | First Excess | Second Excess | Third Excess | Fourth Excess | Fifth Excess | Sixth Excess |
|---|---|---|---|---|---|---|
| **Company's Per Occurrence Retention** | $6,000,000 | $15,000,000 | $42,500,000 | $78,600,000 | $103,700,000 | $190,600,000 |
| **Reinsurer's Per Occurrence Limit** | $9,000,000* | $27,500,000 | $36,100,000 | $25,100,000 | $86,900,000 | $27,800,000 |
| **Reinsurer's Contract Limit** | $9,000,000 | $55,000,000 | $72,200,000 | $50,200,000 | $173,800,000 | $55,600,000 |
| **Annual Minimum Premium** | $3,240,000 | $12,100,000 | $12,996,000 | $6,626,400 | $13,208,800 | $3,558,400 |
| **Exposure Rate** | 0.0059% | 0.0222% | 0.0238% | 0.0121% | 0.0242% | 0.0065% |
| **Annual Deposit Premium** | $4,050,000 | $15,125,000 | $16,245,000 | $8,283,000 | $16,511,000 | $4,448,000 |
| **Deposit Premium Installment** | $1,012,500 | $3,781,250 | $4,061,250 | $2,070,750 | $4,127,750 | $1,112,000 |

* Coverage under the First Excess Layer is first subject to an annual aggregate retention of $9,000,000 of Ultimate Net Loss otherwise recoverable thereunder, in accordance with paragraph B. of the Retention and Limit Article.

Olympus Insurance Company
18032N23 (Eff: 06-01-23)
Property Catastrophe XOL Contract

Schedule A
Page 30

06-26-23



# NUCLEAR INCIDENT EXCLUSION CLAUSE - PHYSICAL DAMAGE - REINSURANCE - U.S.A.

1)   This Agreement does not cover any loss or liability accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2)   Without in any way restricting the operation of paragraph (1) of this Clause, this Agreement does not cover any loss or liability accruing to the Reinsured, directly or indirectly and whether as Insurer or Reinsurer, from any Insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

I.    Nuclear reactor power plants including all auxiliary property on the site, or

II.   Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

III.  Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material," and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

IV.   Installations other than those listed in paragraph 2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3)   Without in any way restricting the operations of paragraphs 1) and 2) hereof, this Agreement does not cover any loss or liability by radioactive contamination accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph 3) shall not operate

a)    where the Reinsured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

b)    where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused.  However, on and after 1st, January 1960, this sub-paragraph b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Government Authority having jurisdiction thereof.

4)   Without in any way restricting the operations of paragraphs 1), 2) and 3) hereof, this Agreement does not cover any loss or liability by radioactive contamination accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5)   It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reinsured to be the primary hazard.

6)   The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954, or by any law amendatory thereof.

7)   Reinsured to be sole judge of what constitutes:

a)    substantial quantities, and

b)    the extent of installation, plant or site.

NOTE:  Without in any way restricting the operations of paragraph 1) hereof, it is understood and agreed that:

a)    all policies issued by the Reinsured on or before 31st, December 1957, shall be free from the application of the other provisions of this Clause until expiry date or 31st, December 1960, whichever first occurs whereupon all the provisions of this Clause shall apply,

b)    with respect to any risk located in Canada policies issued by the Reinsured on or before 31st, December 1958, shall be free from the application of the other provisions of this Clause until expiry date or 31st, December 1960, whichever first occurs whereupon all the provisions of this Clause shall apply.

12/12/57
N.M.A. 1119



## ELECTRONIC DATA EXCLUSION B

1.   **Electronic Data Exclusion**

A.   This Contract does not cover loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programmes, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorised instructions or code including a set of maliciously introduced unauthorised instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

B.   However, in the event that a covered peril results from any of the matters described in paragraph (a) above, this Contract will cover physical damage and resultant business interruption directly caused by such covered peril.

Listed Perils:
Fire
Explosion

2.   **Electronic Data Processing Media Valuation**

Notwithstanding any provision to the contrary within this reinsurance Contract or any endorsement thereto, it is understood and agreed as follows:

A.   Should electronic data processing media insured by the original Policy suffer physical loss or damage insured by the original policy, then the basis of valuation shall be the cost of the blank media plus the costs of copying the ELECTRONIC DATA from back up or from originals of a previous generation.

B.   These costs will not include research and engineering nor any other cost of recreating, gathering or assembling such ELECTRONIC DATA. If the media is not repaired, replaced or restored the basis of valuation shall be the cost of the blank media. However, this Reinsurance does not reinsure any amount pertaining to the value of such ELECTRONIC DATA to the Assured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.

N.M.A. 2915



## LIMITED COMMUNICABLE DISEASE EXCLUSION NO. 2
## (PROPERTY TREATY REINSURANCE)

1.  Notwithstanding any provision to the contrary within this reinsurance agreement, this reinsurance agreement excludes any loss, damage, liability, claim, cost or expense of whatsoever nature, directly or indirectly caused by, contributed to by, resulting from, arising out of, or in connection with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease regardless of any other cause or event contributing concurrently or in any other sequence thereto.

2.  Subject to the other terms, conditions and exclusions contained in this reinsurance agreement, this reinsurance agreement will cover physical damage to property insured under the original policies and any Time Element Loss directly resulting therefrom where such physical damage is directly caused by or arising from any of the following perils: fire, lightning, explosion, aircraft or vehicle impact, falling objects, windstorm, rainstorm, hail, tornado, cyclone, typhoon, hurricane, earthquake, seaquake, seismic and/or volcanic disturbance/eruption, tsunami, flood, freeze, ice storm, weight of snow or ice, avalanche, meteor/asteroid impact, landslip, landslide, mudslide, bush fire, forest fire, riot, riot attending a strike, civil commotion, vandalism and malicious mischief.

### Definitions

3.  "Communicable Disease" means any disease which can be transmitted by means of any substance or agent from any organism to another organism where:

    3.1.  the substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not, and

    3.2.  the method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from or to any surface or object, solid, liquid or gas or between organisms, and

    3.3.  the disease, substance or agent can cause or threaten damage to human health or human welfare or can cause or threaten damage to, deterioration of, loss of value of, marketability of or loss of use of property.

4.  "Time Element Loss" means business interruption, contingent business interruption or any other consequential losses.

LMA5503
15 May 2020